## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In Re:

Jason M. Silver,                       Case No. 17-41723
                                          Chapter 7
_____Debtor._____/     Hon. Joel D. Applebaum

Karen E. Evangelista, Trustee,

           Plaintiff,

v.

                                Adv. Proc. No. 18-04403

Jason M. Silver and L&L Gold
Associates, Inc.,
_____Defendants._____/

## OPINION GRANTING IN PART AND DENYING IN PART
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

      This matter is before the Court on Cross-Motions for Summary Judgment (the "Cross-Motions") filed by plaintiff-trustee, Karen Evangelista ("Trustee") and defendant, L&L Gold Associates, Inc. d/b/a American Jewelry and Loan ("Gold"). Defendant Jason Silver ("Jason Silver" or "Debtor") is not a movant or cross-movant. For the reasons that follow, the Cross-Motions are GRANTED IN PART AND DENIED IN PART.

## INTRODUCTION

      This adversary proceeding was filed on August 30, 2018, and has had a long and, at times, challenging procedural history. Over the course of the last four years,

the parties have mediated twice, resulting in two applications to compromise this litigation. In both instances, Great Lakes Business Credit (n/k/a GLBC Old, LLC) ("Great Lakes") objected to the proposed settlements as not being in the best interests of the estate and its creditors and both times the Court denied the proposed settlements. [1] Eventually, Great Lakes sought to intervene in this adversary proceeding to prosecute the statutory and common law conversion claims, a request which the Court granted on September 13, 2021, over Gold's objections. (AP Dkt. 164). Ultimately, Great Lakes and the Trustee reached an agreement, subject to Court approval, whereby Great Lakes would take an assignment of *all* of the claims in this adversary proceeding. The Court's concerns over whether chapter 5 causes of action could be sold or assigned by the Trustee led Great Lakes, with the Trustee's consent, to seek derivative standing to prosecute this case on behalf of the estate, which the Court granted over Gold's objections in an Opinion read into the record on July 28, 2022 (AP Dkt. 220).

The Trustee's complaint in this adversary proceeding (AP Dkt. 1), now being prosecuted by Great Lakes, alleges seven separate counts as follows: Count I- avoidance of preferential transfers; Count II – avoidance of fraudulent transfers

---

[1] The first settlement was denied by Chief Bankruptcy Judge Philip Shefferly and, after his retirement and the reassignment of this case, the second proposed settlement was denied by this Court.

under section 548 of the Bankruptcy Code; Count III – avoidance of fraudulent transfers under state law; Count IV – avoidance of improper post-petition transfers under section 549 of the Bankruptcy Code; Count V – statutory conversion; Count VI – common law conversion; and Count VII – seeking a declaratory judgment that debtor/defendant, Jason Silver, is the alter ego of his company, Silver's Jewelry and Loan, Inc. ("Silver's Jewelry and Loan").

For the purposes of the instant Cross-Motions, several of the counts in the Complaint are no longer at issue. At the most recent hearing on the Cross-Motions, held on September 28, 2022, Great Lakes voluntarily dismissed Counts I, II, and IV (AP Dkt. 227). With respect to Count V, Great Lakes acknowledged that statutory conversion requires a showing of knowledge, an issue of fact that cannot be decided on summary judgment. This leaves only three counts to be addressed at this time: Count III (avoidance of fraudulent transfers under state law alleging actual intent to hinder, delay or defraud creditors); Count VI (common law conversion); and Count VII (alter ego). Great Lakes further limited the issues as to Count VI, common law conversion, noting that even if liability is determined favorably as to Great Lakes (because, unlike statutory conversion, a showing of knowledge is not required), damages resulting from any alleged conversion is an issue of fact that cannot be decided on summary judgment. *Id*.

3

Thus, the Court need only address Counts III, VI (liability only), and VII.[2] As to these three counts, the Court grants Gold's Motion for Summary Judgment on Counts III and VII and grants Great Lakes' Motion for Summary Judgment on Count VI as to liability only.   In light of the Court's rulings, only Count V (liability and damages) and Count VI (damages only) remain for trial.

## STATEMENT OF FACTS

Silver's Jewelry and Loan was a pawn shop wholly owned and operated by Jason Silver.[3]

---

[2] At the September 28th hearing, Gold raised for the first time the issue of jurisdiction, asserting that this Court lacks subject matter jurisdiction over this case. While a challenge to subject matter jurisdiction may be raised at any time, *Spierer v. Federated Dep't Stores, Inc. (In re Federated Dep't Stores, Inc.)*, 328 F.3d 829, 833 (6th Cir. 2003), Gold has not filed a motion challenging this Court's subject matter jurisdiction and Great Lakes has not had an opportunity to respond. Accordingly, the Court cannot address this issue at this time.

[3] Michigan law defines "pawnbroker" as "[a] person, corporation, or member, or members of a co-partnership or firm, who loans money on deposit, or pledge of personal property, or other valuable thing, other than securities or printed evidence of indebtedness, or who deals in the purchasing of personal property or other valuable thing on condition of selling the same back again at a stipulated price." MICH. COMP. LAWS § 446.203(e).   Pawn shops make short-term secured non-recourse personal loans in exchange for holding personal property as collateral (for example, jewelry, electronics, musical instruments or firearms).   A pawnbroker typically lends between 25% and 60% of the value of the collateral. "Title to an item that is pledged or pawned vests in the pawnbroker 90 days after the pledge or pawn, or after the expiration of any longer period agreed to by the parties, if the borrower has not paid the debt, interest, and charges on the item that was pledged or pawned." M.C.L.§ 466.210.

4

On December 3, 2013, Silver's Jewelry and Loan executed a promissory note for a $1,150,000 line of credit in favor of Great Lakes (AP Dkt. 1, Ex. D). The line of credit was guaranteed by Debtor, the Jason Silver Trust (the entity which held Debtor's ownership interest in Silver's Jewelry and Loan), Debtor's mother, Cheryl Silver, and the Cheryl Silver Trust. The line of credit was to be used to fund pawn loans, and it was secured by all of Silver's Jewelry and Loan's assets. The security agreement defines the "collateral," in relevant part, as follows:

> Collateral shall mean all personal property of Debtor including, without limitation, all of the following property Debtor now or later owns or has an interest in, wherever located:
>
> All Accounts Receivable (for purposes of this Agreement, "Accounts Receivable" consists of all accounts, general intangibles, chattel paper (including without limit electronic chattel paper and tangible chattel paper), contract rights, deposit accounts, documents, instruments and rights to payment evidenced by chattel paper, documents or instruments, health care insurance receivables; commercial tort claims, letters of credit letter of credit rights, supporting obligations, and rights to payment for money or funds advanced or sold),
>
> all Inventory,
>
> . . .
>
> All goods, instruments, (including, without limit, promissory notes), documents (including, without limit, negotiable documents), policies and certificates of insurance, deposit accounts, and money or other property (except real property which is not a fixture) which are now or later in possession of Lender or as to which Lender now or later controls possession by documents or otherwise, and
>
> All additions, attachments, accessions, parts, replacements,

5

substitutions, renewals, interest, dividends, distributions, rights of any kind (including, but not limited to stock splits, stock rights, voting and preferential rights), products, and proceeds of or pertaining to the above including, without limit, cash or other property which were proceeds and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by Debtor.

In the definition of Collateral, a reference to a type of collateral shall not be limited by a separate reference to a more specific or narrower type of that collateral.

(AP Dkt. 1, Ex. D at 20-21).[4]   The security agreement required Silver's Jewelry and Loan to deliver to Great Lakes "all payments received in connection with the collateral and from the sale, lease or other disposition of any collateral."   (*Id.* at 24).

On November 26, 2013, Great Lakes perfected its security in interest in Silver's Jewelry and Loan's assets by filing a UCC-1 Financing Statement with the State of Michigan.   (AP Dkt. 1, Ex. F).   The language in the UCC filing describing the collateral mirrors the language in the security agreement.

Great Lakes monitored its collateral by way of monthly audits whereby it would send a representative to Silver's Jewelry and Loan to take a random sampling of physical pawn inventory and compare it to inventory reports provided by Silver's Jewelry and Loan.   (AP Dkt. 114, Ex. 2, Deposition of Jason Silver at 24-25,

---

[4] Inventory includes items that were pawned by customers but not redeemed at the end of the loan period, as well as items Silver's Jewelry and Loan purchased outright from customers.

hereinafter "Silver Dep. at __").

The loan was amended, extended, and renewed annually through January, 2017. (AP Dkt. 1, Ex. E). Debtor's guaranty was similarly renewed and reaffirmed annually through January 2017. (AP Dkt. 1, Ex. G).

Sometime in 2014, Silver's Jewelry and Loan began to experience financial difficulties. Unbeknownst to Great Lakes, Silver's Jewelry and Loan and/or Debtor began borrowing funds from Gold, a local competing pawn shop.[5] Based upon the deposition testimony of Gold's owner, Les Gold, Gold summarized its arrangement with Silver's Jewelry and Loan in its Reply Brief as follows:

> A customer pawns a ring at Silver's, wanting $1,000 as a loan amount. Silver's did not have the $1,000 to loan, so Debtor brought the ring to L and L Gold, who gave Debtor the $1,000 to give to the customer (Exhibit 1 at 44). L and L Gold would write up a pawn ticket under Debtor's name (*Id*. at 56). Debtor then gave the $1,000 to the customer as a pawn loan. The customer never knew L and L Gold was subsidizing Silver's loans (*Id.* at 44).

> After three months, the customer would come in to pay the interest to renew the loan. Debtor would then pay L and L Gold two-thirds of the interest allowed by law, and L and L Gold would renew the pawn loan by giving Debtor a new ticket. When the customer came back to Silver's to pay off the loan, Debtor would tell the customer that he had to get it out of the vault. Debtor would then go to L and L Gold, pay back L and L Gold the money it loaned to Debtor, retrieve the ring and give it back to the customer (*Id.*).

---

[5] To disguise Silver's Jewelry and Loan's financial difficulties and its various transactions with Gold, Silver's Jewelry and Loan provided Great Lakes with false and fraudulent financial statements regarding its pawn loans and inventory. (Silver Dep. at 47-49 and 66). *See* footnote 9, *infra.*

7

. . .

> There were also times where Debtor would bring in a batch of pawn loans. If Silver's needed $50,000, Debtor took $50,000 worth of pawn loans to L and L Gold, which were then put in Debtor's name (*Id.* at 56-57). Thus, Silver's pawned its own pawn loans (*Id.* at 57). Title to the merchandise that was pawned by the customer remained with the customer, but L and L Gold now held the merchandise . . . . When a customer went to Silver's to renew the loan by paying the interest, Debtor would pay two-thirds of the interest he collected to L and L Gold (*Id.* at 44).

Defendant's Supplemental Response Brief, AP Dkt. 214 at pp. 3-5, citing the deposition of Leslie Gold, attached to the Brief as Ex. 1).[6]

At some point, Gold determined that it had not been paid the interest payments to which it was entitled. Les Gold testified that, as a result, a different arrangement became necessary. To that end, on March 8, 2016, Silver's Jewelry and Loan and Gold entered into an Asset Purchase Agreement ("the APA", AP Dkt. 1, Ex. I). Pursuant to the APA, Silver's Jewelry and Loan sold and transferred to Gold some of its existing pawn loans, as well as transferring to Gold the underlying collateral securing those pawn loans.[7] In exchange, Gold forgave loans previously made to

---

[6] Les Gold clearly testified that all of the pawn tickets issued by Gold were issued to Jason Silver as the customer, not Silver's Jewelry and Loan. According to Les Gold, "It had to. I cannot take a loan from a business. I had to take a loan from a person--." (AP. Dkt. 214, Ex. 1, Deposition of Leslie Gold at 77, hereinafter "Gold Dep. at __").

[7] A list of the then existing pawn loans was purportedly attached to the APA as "Schedule 1." However, no such schedule was attached to the copy of the APA submitted to the Court, nor, according to the parties, has the list turned up during discovery.

Silver's Jewelry and Loan aggregating $433,090.00. Henceforth, Gold was to collect all interest from the transferred pawn loans which accrued prior to the date of the APA. Subsequent to the date of the APA, however, Gold would pay one-third of the interest received on the sold pawn loans by check to Jason Silver or Silver's Jewelry and Loan, as Jason Silver directed, with Gold retaining the remaining two-thirds. Gold also retained all rights in the collateral securing the pawn loans, subject only to the rights of the person who pawned the collateral to redeem his or her property. Under Paragraph 6(a)(iii) of the APA, Silver's Jewelry and Loan specifically represented and warranted that "[s]ubject only to the rights of the [pawn] customers . . . [Silver's] owns the Loan Assets, free and clear of all liens and encumbrances, and may assign them to [Gold] without obtaining the consent of any other party."[8]

---

[8] Les Gold's testimony, along with the APA, clarify that the transactions between Debtor, Silver's Jewelry and Loan, and Gold took two different forms. Gold funded individual pawn loans for Silver's Jewelry and Loan when Silver's Jewelry and Loan lacked the money to do so. Gold did this by writing a pawn ticket to Jason Silver secured by the pawn ticket Silver's Jewelry and Loan had previously written or was planning to write to the pawnor. This type of transaction apparently continued even after the APA was executed. Gold also purchased pawn loans, individually and in bulk, that had previously been funded by Silver's Jewelry and Loan (for example, the pawn loans covered by the APA). With respect to these latter transactions, Gold contends that "Asset Purchase Agreement" was a misnomer because Gold was not purchasing the pawnor's underlying collateral. But this assertion misses the point. While it is true that Gold was not purchasing the underlying collateral securing Silver's Jewelry and Loan's pawn loans, it is clear that Gold was purchasing the pawn loans made by Silver's Jewelry and Loan.

9

By early 2017, Silver's Jewelry and Loan was in default on its line of credit. Great Lakes sued both Silver's Jewelry and Loan and the guarantors in state court and obtained the appointment of a state court receiver.

Subsequently, on February 9, 2017, Jason Silver filed an individual chapter 13 bankruptcy petition. According to his schedule B (personal property), Jason Silver owns 100% of Silver's Jewelry and Loan through his Jason Silver Revocable Trust ("the Trust"). Jason Silver is the settlor and sole trustee of the Trust. Schedule D (secured debts) lists the debt owed to Great Lakes in the amount of $1,030,207.00, arising from Jason Silver's personal guaranty.[9] Gold is not listed as a creditor on Debtor's schedules because Jason Silver, individually, did not guaranty the APA.

On July 31, 2017, by agreement of the parties, Debtor's chapter 13 case was converted to chapter 7. Shortly after the case was converted, the Chapter 7 Trustee executed two documents. The first document expressly revoked the Jason Silver Revocable Trust. (AP Dkt. 1, Ex. B). The second document declared that "[b]y revoking the Trust, the shares of [Silver's Jewelry and Loan] became property of the

---

[9] Great Lakes filed an adversary proceeding seeking to have its claim against Debtor held non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (B). That adversary proceeding was resolved through the entry of a consent judgment awarding Great Lakes a non-dischargeable judgment against Debtor in the amount of $1,019,134.09 (AP 17-04368, Dkt. 18, August 24, 2017).

10

Debtor's bankruptcy estate, under the control of the Trustee" and that the Trustee "has possession, control, and all power and authority over the Debtor's shareholder interest in Silver's." (AP Dkt. 1, Ex. C). The second document also purported to recognize the Trustee as the sole shareholder of Silver's Jewelry and Loan, removed Debtor from all positions of "power, control or authority over Silver's" and authorized the Trustee "to take all managerial actions with respect to Silver's Jewelry and Loan, including its dissolution, and liquidation and distribution of assets." *Id.*

On March 6, 2018, Great Lakes, the Trustee, Jason Silver, and Cheryl Silver stipulated that Great Lakes had a perfected security interest in all of Silver's Jewelry and Loan's assets. (Bankr. Dkt. 157). The state court receiver turned over all of Silver's Jewelry and Loan liquid funds, $38,054.00, to Great Lakes.[10]

On August 30, 2018, the chapter 7 Trustee filed this adversary proceeding against Jason Silver and Gold. On October 27, 2020, Gold filed a Motion for Summary Judgment, and on November 30, 2020, the Trustee filed her Cross Motion for Summary Judgment.

---

[10] The agreement also provided that any diamonds, jewels, and cut glass held by the Receiver could be sold by the Trustee, with the sale proceeds being used to: (1) pay the Trustee's fee; (2) pay $2,500 to the estate for the benefit of creditors, and (3) pay any remaining balance to Great Lakes. (Bankr. Dkt. 157 and 158).

## JURISDICTION

The Trustee's fraudulent transfer claim is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Court has jurisdiction over this claim pursuant to 28 U.S.C. §§ 1334 and 157. With respect to the Trustee's conversion claims, this Court has "related to" jurisdiction under 28 U.S.C. §§ 1334(b). In this case, all of the parties have expressly consented to entry of a final order or judgment by this Court. (AP Dkt. 20).

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c), incorporated into bankruptcy adversary proceedings by Fed. R. Bankr. P. 7056. The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. 317, 323. Once the movant meets this burden,

the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To demonstrate a genuine issue of material fact in dispute, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *Liberty Lobby*, 477 U.S. at 252. The Court must believe the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *Liberty Lobby*, 477 U.S. at 255.

## ANALYSIS

## I. COUNT III – AVOIDANCE UNDER MICHIGAN UNIFORM VOIDABLE TRANSFER ACT

11 U.S.C. § 544(b) provides that ". . . the trustee may avoid any transfer of an interest *of the debtor* in property . . . that is voidable under applicable law . . . ." (emphasis added). The applicable law here is the Michigan Uniform Voidable Transfer Act (f/k/a the Michigan Uniform Fraudulent Transfer Act), M.C.L. § 566.34, and Count III of the Complaint alleges avoidable fraudulent transfers under this Act. M.C.L. § 566.34 provides in pertinent part:

> . . . *a transfer made* or obligation incurred *by a debtor* is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, *if the debtor made the transfer* or incurred the obligation in either of the following circumstances:
>
> (a) With actual intent to hinder, delay, or defraud any creditor of the

debtor.

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor did either of the following:

(i)     Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

(ii)    Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(emphasis added).

As is apparent from the emphasized language, section 544 of the Bankruptcy Code and the Michigan statute apply only to transfers made *by the debtor*.   Here, however, the debtor is Jason Silver and it is uncontested that the transfers at issue were made, not by Jason Silver, but exclusively by Silver's Jewelry and Loan, a non-debtor company.    Under the plain language of both statutes, it would seem that this count cannot withstand scrutiny and summary judgment must be granted to Gold. *See Liss v. Lewiston-Richards, Inc.*, 732 N.W.2d 514, 517 (Mich. 2007) ("When interpreting a statute, this [Michigan Supreme] Court attempts to give effect to the Legislature's intent by looking at the statutory text, giving meaning to every word, phrase, and clause in the statute and considering both their plain meaning and their context").   *See also Moyer v. Kooistra (In re Przybysz)*, 2012 Bankr. LEXIS 6333, *11 (Bankr. W.D. Mich. November 29, 2012) (applying plain language analysis to

14

11 U.S.C. § 544(b)(1)).

Great Lakes hopes to avoid this conclusion by reference to the allegations in the Trustee's Complaint that Silver's Jewelry and Loan "is the alter ego of the Debtor [Jason Silver] and, as a result any and all assets of the [sic] Silver's are assets of the Debtor and property of the Debtor's estate." (Complaint, AP Dkt. 1 at 16). This assertion was reiterated in Count VII of the Complaint, which seeks a declaratory judgment that:

> The Debtor clearly and cavalierly used Silver's [Jewelry and Loan] as a mere instrumentality to support his and his wife's lavish lifestyle at the expense of his and Silver's creditors. The Debtor [Jason Silver] pledged and, in fact, transferred to the Defendant assets of Silver's [Jewelry and Loan], which were subject to Great Lakes' security agreements to obtain funds from the Defendants to support his lifestyle and for other non-business purposes at Great Lakes' expense and the expense of Debtor's and Silver's [Jewelry and Loan] other creditors.

*Id*., ¶¶ 50-51 at 20.

Based on these allegations, the Trustee requests that the Court "pierce the corporate veil, *declare that* the Debtor is the alter ego of Silver's and that *all of the assets of Silver's are property of the Debtor's bankruptcy estate*." *Id*. at 21 (emphasis added). The Trustee believes that if she is successful, the assets of Silver's Jewelry and Loan will become part of Jason Silver's bankruptcy estate. Those assets would include Silver's Jewelry and Loan's fraudulent transfer claims against Gold under the Michigan Voidable Transfer Act.

15

The equitable theories of veil piercing (whether traditional or reverse veil piercing) and alter ego are not helpful to the Trustee for two reasons. First, under Michigan law, veil piercing does not transform the alter ego's property into the property of the debtor, but rather simply allows a creditor to pursue the alter ego under a vicarious liability theory. Therefore, the trustee has not stated a claim under § 544 and § 548, both of which require that the debtor have an interest in the transferred property. Second, traditional or reverse veil piercing here is impermissible because one cannot commit a fraud or wrong against oneself. Jason Silver committed the fraud giving rise to all of the claims brought by the Trustee. The Trustee standing in Jason Silver's shoes cannot be said to have suffered an actionable loss or injury as a result of Jason Silver's fraudulent machinations.

Turning to the first reason, as the Sixth Circuit explained in *Spradlin v. Beads and Steads Inn, LLC (In re Howland)*, 674 Fed. Appx. 482, 485-487 (6th Cir. 2017) (applying Kentucky law), "[t]o state a claim under §544 and §548 based on a veil-piercing theory, the trustee must establish two propositions of [the applicable state] law. . . . First, she must demonstrate that [the state's] law allows litigants to use veil piercing as a way to consolidate two entities. If so, the trustee must then establish that [the state's] law recognizes the particular variety of veil piercing she seeks to use here: 'reverse' veil piercing." *Id*. at 485 (internal citation omitted).

In analyzing whether Kentucky law allows litigants to use veil piercing to

consolidate two entities, the court continued:

> On the first point – whether a litigant may use veil piercing to consolidate a debtor and its alter ego into a single entity – the cases fall into two camps. The first camp applies what courts sometimes refer to as the "identity" approach to veil piercing. Under this approach, piercing the corporate veil "expands the debtor's estate to include the property of its alter ego" by "deeming a corporation and its alter ego to be a single entity.". . . . "As a result, a 'corporation has, in some sense, an equitable interest in the assets of its alter ego.'"

*Id*. at 486 (internal citations omitted) This was the approach advocated by the trustee in *Howland* and, as the instant Complaint makes clear, by the Trustee in this case.

In contrast, "[t]he second camp employs veil piercing as a form of vicarious liability, shifting liability from the debtor to its alter ego . . . . Under this approach, '[t]he doctrine of alter ego does not create assets for or in the corporation. It simply fastens liability upon the individual who uses the corporation merely as an instrumentality in the conduct of his own personal business . . . .'" *Id*. (internal citations omitted) The *Howland* court concluded that Kentucky falls into this second camp. As a result, "[b]ecause Kentucky veil piercing does not transform the alter ego's property into the property of the debtor, but rather simply allows a creditor to pursue the alter ego under a vicarious liability theory, the trustee has not stated a claim under § 544 and § 548, both of which require that *the debtor* have an interest in the transferred property." *Id*. at 487 (emphasis in original). *See also*

M.C.L. § 566.34.   In light of its conclusion, the Sixth Circuit did not have to address whether Kentucky would recognize reverse veil piercing.   *Id*. at 490, n.3

Michigan also falls into this "second camp" and, for this reason, the property of Silver's Jewelry and Loan, Inc. is not 'transformed' into property of Jason Silver's estate.   *Moyer v. Kooistra (In re Przybysz)*, 2012 Bankr. LEXIS 6333 at *21 ("So, even assuming the Trustee had standing to invoke the alter ego doctrine, either as the Debtor's successor under 11 U.S.C. § 541 or the representative of creditors under§ 544(a), *the doctrine would not permit the court to treat the Related Entities' property as the Debtor's*, such that the Trustee could then pursue the Defendants in these proceedings.") (emphasis added)   Judge Dales' conclusion in *Przybysz* is equally applicable here.   Even if Great Lakes were successful in prosecuting alter ego or veil piercing claims, under Michigan law the assets of Silver's Jewelry and Loan would not be consolidated with Jason Silver's estate.   Without consolidation, the fraudulent transfer claims against Gold belonging to Silver's Jewelry and Loan -- the prize the Trustee seeks -- do not become property of Jason Silver's estate. Therefore, the Trustee, standing in Jason Silver's shoes, cannot pursue the fraudulent transfer claims belonging to Silver's Jewelry and Loan against Gold.[11]

---

[11]   For unknown reasons, Silver's Jewelry and Loan is not a defendant in this adversary proceeding and, therefore, no alter ego or veil piercing claim has been asserted against it, a seemingly important step in the process.   Nor did the Trustee, as the self-declared sole authority over Silver's Jewelry and Loan, place it into

18

There is a second reason why the Trustee, now Great Lakes, cannot pursue the fraudulent transfer claims belonging to Silver's Jewelry and Loan against Gold under an alter ego or veil piercing theory. The Sixth Circuit has further instructed that, under Michigan law, a subsidiary cannot sue its shareholders or parent corporation under an alter ego theory. *Spartan Tube and Steel, Inc. v. Himmelspach (In re RCS Engineered Products Co., Inc.)*, 102 F.3d 223, 225-228 (6th Cir. 1996). According to the *RCS* court,

> in order for a subsidiary to be able to assert an alter ego claim against its parent company, the subsidiary would need to show that it suffered "an unjust loss or injury" as a result of it being used by the parent as an instrumentality to commit a fraud or wrong against itself. Since it is axiomatic that one cannot commit a fraud or wrong against oneself, a subsidiary would never be able to satisfy the standard for disregarding corporate identity under Michigan law. It would, therefore, appear that under Michigan law a subsidiary may not assert an alter ego claim against its parent corporation.
>
> That a subsidiary does not have standing to raise an alter ego claim against its parent is further supported by basic principles of corporate law. The general rule is that the corporate veil is pierced only for the benefit of third parties, and never for the benefit of the corporation or its stockholders.

*Id.* at 226 (internal citations omitted).

---

bankruptcy so that Silver's Jewelry and Loan could directly assert its own fraudulent transfer claims against Gold, *see Moyer v. Kooistra (In re Przybysz)*, 2012 Bankr. LEXIS 6333 at *15, n.10, or authorize Silver's Jewelry and Loan to pursue fraudulent transfer claims against Gold in state court under the Michigan Voidable Transfer Act.

19

Although the *RCS Engineered Products* case involved a subsidiary asserting an alter ego claim against its shareholder/parent corporation, the Sixth Circuit's analysis is equally applicable where, as here, a trustee standing in the shoes of the sole shareholder seeks to assert an alter ego claim against the shareholder's corporation. *Simon v. Miller (In re Miller Parking Co., LLC)*, 536 B.R. 197, 205 (E.D. Mich. 2015) (applying *RCS Engineered Products* to reject attempt by LLC's member to assert claims belonging to the LLC against third parties). Moreover, as Judge Dales recognized in *Przybysz)*, 2012 Bankr. LEXIS 6333 at *24, "[a] trustee who asserts his debtor's rights under 11 U.S.C. § 541 obtains no greater rights or title than his debtor enjoyed prepetition." Accordingly, "Michigan law would not permit the Debtor (as shareholder) to pierce the corporate veil in order to use the Related Entities property to satisfy his own debtors. Doing so violates a foundation of corporate law – the absolute priority rule – which provides that the debts of a corporation must be satisfied (or provided for) before the shareholder may profit." *Id*. at *23.

Here, the Trustee stands in the shoes of Jason Silver. Although she announced herself as the sole shareholder with all managerial authority over Silver's Jewelry and Loan, she elected not to place that entity into bankruptcy or to pursue its claims directly against Gold in state court (although, ostensibly, she had the right to do so). She now wants to use reverse veil piercing, not simply to fasten liability

18-04403-jad    Doc 228    Filed 12/09/22    Entered 12/09/22 13:38:47    Page 20 of 39

on Silver's Jewelry and Loan, but to go much further. She wants to treat the assets of Silver's Jewelry and Loan as if they were consolidated with Jason Silver's estate and thereby assert fraudulent transfer claims belonging to Silver's Jewelry and Loan against Gold for the benefit of Jason Silver's estate. Traditional or reverse veil piercing here is impermissible for the reason stated in *RCS Engineered Products*: one cannot commit a fraud or wrong against oneself. Jason Silver committed the fraud giving rise to all of the claims brought by the Trustee. Jason Silver (or the Trustee standing in his shoes) cannot be said to have suffered an actionable loss or injury as a result of his own fraudulent machinations with Silver's Jewelry and Loan.[12]

Accordingly, for all of these reasons, the Court grants Gold's Motion for Summary Judgment with respect to Count III of the Trustee's Complaint.

---

[12] As noted by the court in *Miller Parking*, the remedy in cases where a debtor's financial affairs are inextricably intertwined with those of another entity is substantive consolidation. *Miller Parking*, 536 B.R. at 205-206. During the September 28th hearing, Great Lakes' counsel suggested that the Court treat the Complaint as alleging a substantive consolidation count or permit amendment at this late date. The Court cannot do so for two reasons. First, Silver's Jewelry and Loan, the entity to be consolidated, is not a party to this lawsuit and creditors other than Great Lakes have not been given an opportunity to weigh in on this "unusual equitable remedy." *Id*. Second, and more importantly, substantive consolidation applies, colloquially, only when the entities to be consolidated are so hopelessly intertwined that they cannot be separated, i.e. the egg cannot be unscrambled. *Id*. Nothing in the record suggests that is the case here.

## II.  COUNT VII – DECLARATORY JUDGMENT

Count VII of the Complaint, titled "Declaratory Judgment," relies on the same legal theories as Count III, and fails for the same reasons.    Count VII alleges:

> The Debtor clearly and cavalierly used Silver's as a mere instrumentality to support his and his wife's lavish lifestyle at the expense of his and Silver's creditors.  *The Debtor* [Jason Silver] *pledged and, in fact, transferred to the Defendant [Gold] assets of Silver's*, which were subject to Great Lakes' security agreements to obtain funds from the Defendant to support his lifestyle and for other non-business purposes at Great Lakes' expense and the expense of Debtor's and Silver's other creditors.

*Id*., ¶¶ 50-51, p. 20 (emphasis added).   Based on these allegations, the Trustee requests the Court to "pierce the corporate veil, declare that the Debtor is the alter ego of Silver's *and that all of the assets of Silver's are property of the Debtor's bankruptcy estate*." *Id*., p. 21 (emphasis added). As previously explained, the Trustee's theories of veil piercing and alter ego are unavailable here and, therefore, the Trustee is not entitled to the declaratory relief she seeks.   For these reasons, summary judgment is granted to Gold on Count VII of the Trustee's Complaint.

## III.  COUNT VI – COMMON LAW CONVERSION

Count VI of the Complaint alleges that Gold, by buying Silver's Jewelry and Loan's pawn loans, by executing the APA, and by using "the principal and interest arising from the pawn loans and the collateral securing those loans . . . [acted] in contravention of Great Lakes' security interest," thereby converting Great Lakes'

property (AP Dkt. 1, ¶ 48).    Count VI specifically asserts common law conversion.

Because the Bankruptcy Code does not define "conversion," the Court looks to state law.    *Butner v. United States*, 440 U.S. 48 (1979).    Under Michigan common law,

> Conversion is defined as any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein.   In general, it is viewed as an intentional tort in the sense that the converter's actions are willful, although the tort can be committed unwittingly if [the defendant is] unaware of the plaintiff's outstanding property interest.

*Foremost Ins. Co. v. Allstate Ins. Co.,* 486 N.W.2d 600, 606 (Mich. 1992).    *See also Bruinsma v. Wigger (In re Wigger),* 595 B.R. 236, 254 (Bankr. W.D. Mich. 2018), quoting *Dantone v. Dantone (In re Dantone)*, 477 B.R. 28, 38 (BAP 6th Cir. 2012)("No intent to violate the property rights of another, or knowledge that another's property rights are being violated, is required.")

In determining whether an act of conversion occurred here, the Court is required to identify what interest, if any, Great Lakes had in the pawn loans.   It is undisputed that Silver's Jewelry and Loan executed an all-assets security agreement in favor of Great Lakes.   (AP Dkt. 1, Ex. D).   That security agreement defines "collateral" very broadly, and plainly granted Great Lakes a security interest in all of Silver's Jewelry and Loan's pawn loans, any interest paid on those loans, all of Silver's Jewelry and Loan's inventory, and proceeds from the sale of the collateral

23

(as defined in the security agreement). Great Lakes properly perfected its security interest in the collateral by filing a UCC-1 financing statement with the Michigan Secretary of State. In describing the collateral, the language in the UCC-1 filing mirrors the broad language of the security agreement. As previously noted, the Trustee also stipulated that Great Lakes properly perfected its security interest. (Bankr. Dkt. 157).

All of the collateral in which Great Lakes holds a security interest under the security agreement is personal property and is, therefore, governed by Article 9 of the Uniform Commercial Code, M.C.L. § 440.9101, *et. seq.,* which applies to any transaction regardless of form that contractually creates "a security interest in personal property . . . ." M.C.L. § 440.9109(1)(a). This includes the pawn loans made by Silver's Jewelry and Loan.

The Michigan Pawnbrokers Act requires a pawnbroker to give its customer a pawn ticket, which is a memorandum or note signed by the pawnbroker and delivered to the person pawning or pledging their personal property. M.C.L. § 446.208. The pawnbroker is legally required to keep a record of the article it receives that includes, among other things, a description of the article, a sequential transaction number, and any amount of money loaned on the article. M.C.L. § 446.205. Silver's Jewelry and Loan kept records in compliance with the statutory requirements: duplicate pawn tickets (one given to the customer and the other held

24

by Silver's Jewelry and Loan), and records of the specific items pawned and accompanying loan details, which were kept electronically and on the envelope holding the collateral. (Silver Dep. at 8-12; Gold Dep. at 43).

Great Lakes argues that Silver's Jewelry and Loan's pawn tickets and envelopes, as described by the parties, fall within the definition of "chattel paper," which, under the UCC, "means a record or records that evidence both a monetary obligation and a security interest in specific goods. . . . ." M.C.L. § 440.9102(k). This Court agrees that the pawn documents constitute chattel paper within the meaning of M.C.L. § 440.9102(k).[13]

Under Article 9 of the UCC, when a debtor transfers a secured creditor's collateral to another, the secured creditor's lien follows the collateral. Specifically, M.C.L. § 440.9315(1)(a), titled "Secured party's rights on disposition of collateral and in proceeds" provides in relevant part:

> (1) Except as otherwise provided in this article . . . both of the following apply:
>
> (a) A security interest . . . continues in collateral notwithstanding sale, lease, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest . . . .

---

[13] Gold does not directly dispute that pawn tickets and envelopes constitute chattel paper. Rather, as addressed *infra*, Gold argues that it took Silver's Jewelry and Loan's pawn loans free and clear of Great Lakes' security interest or, alternatively, that Article 9 of the UCC does not control here.

25

(b) A security interest attaches to any identifiable proceeds of collateral.

. . .

(3) A security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected.

In this case, in many individual transactions and in bulk transactions under the APA and afterwards, Silver's Jewelry and Loan sold or pledged Great Lakes' collateral to Gold. Great Lakes did not authorize these transactions, nor did Great Lakes agree to release its security interest in the collateral. As a result, Gold took Great Lakes' collateral (the pawn loans, interest payments on the pawn loans, and any collateral securing the pawn loans if the pawn items were not redeemed, i.e. inventory) subject to Great Lakes' perfected security interests.

In response, Gold argues that, even assuming Great Lakes' security interests continue in the collateral, Gold has priority over Great Lakes' security interests under M.C.L. § 440.9330, titled "Priority of purchaser of chattel paper or instrument." That section states, in relevant part:

A purchaser of chattel paper has priority over a security interest in the chattel paper that is claimed other than merely as proceeds of inventory subject to a security interest if the purchaser gives new value and takes possession of the chattel paper or obtains control of the chattel paper under section 9105 [Control of electronic chattel paper] in good faith, *in the ordinary course of the purchaser's business*, and without knowledge that the purchase violates the rights of the secured party.

M.C.L. § 440.9330(2)(emphasis added). Under this section, a purchaser of chattel

26

paper may take priority over a prior perfected security interest in chattel paper if, among other things, the buyer takes possession in the "ordinary course of the purchaser's business."

This argument fails because Gold, the purchaser here, is a pawnbroker and the scope of its business is defined by statute. By law, pawnbrokers are in the business of making secured non-recourse loans to individuals, the pawnors, using property owned by the pawnors as collateral for the loans. Here, however, Gold was making loans to an individual, Jason Silver, secured by collateral that did not belong to Jason Silver -- pawn tickets issued by Silver's Jewelry and Loan.[14] Nothing in Michigan's pawnbrokers statute supports the notion that writing pawn tickets secured by another pawn shop's pawn tickets is in the ordinary course of business. In fact, Michigan's definition of pawnbroker appears to expressly take such transactions out of the ordinary course of business. The statute defines a pawnbroker as a party "who loans money on deposit, or pledge of personal property, or other valuable thing, *other than securities or printed evidence of indebtedness . . . ."* M.C.L. § 446.203(e)(emphasis added). A pawn ticket and any records required by statute to be retained by the

---

[14] As previously noted, Les Gold admitted that Gold wrote all pawn tickets to Jason Silver personally, because pawnbrokers are legally prohibited from writing pawn tickets to businesses and thus Gold could not write the tickets directly to Silver's Jewelry and Loan. (Gold Dep. at 77). Writing pawn loans to an individual to deliberately circumvent a statutory prohibition also cannot be said to be in the ordinary course of the business.

pawnbroker are clearly "printed evidence of indebtedness."[15]

Gold further argues that, even if its reliance on M.C.L. § 440.9330 is unsuccessful, M.C.L. § 440.9333 controls the transactions at issue and, under this section, Gold holds a possessory lien that takes priority over Great Lakes' security interests. M.C.L. § 440.9333, titled "Priority of certain liens arising by operation of law" provides:

> (1) As used in this section, "possessory lien" means an interest, other than a security interest or an agricultural lien, that meets all of the following:
>
> > (a) It secures payment or performance of an obligation for services or material furnished with respect to *goods* by a person in the ordinary course of the person's business.
> >
> > (b) It is created by statute or rule of law in favor of a person.
> >
> > (c) Its effectiveness depends on the person's possession of the *goods*.
>
> (2) A possessory lien on *goods* has a priority over a security interest in the *goods* unless the lien is created by a statute that expressly provides otherwise.

(emphasis added).

This UCC section addresses the priority of a statutory possessory lien given for services or materials relating to "goods" relative to a perfected Article 9 security

---

[15] Funding pawn loans for another pawn shop, or making pawn loans secured by pawn loans, is distinguishable from one pawn shop purchasing another pawn shop outright. Article 9 expressly excludes "[a] sale of . . . chattel paper . . . as part of the sale of the business out of which they arose." M.C.L. § 440.9109(4)(d). In this case, Gold offered to buy Silver's Jewelry and Loan, but Jason Silver declined the offer. (Gold Dep. at 23-25; Silver Dep. at 52-53).

interest. By its terms, this section does not apply here because pawn loans, being chattel paper, are expressly excluded from Article 9's definition of "goods." M.C.L. § 440.9102qq ( "*'Goods' . . . does not include* accounts, *chattel paper*, commercial tort claims, deposit accounts, documents, general intangibles, instruments, investment property, letter-of-credit rights, letters of credit, money, or oil, gas, or other minerals before extraction.") (emphasis added).

Because Great Lakes had a properly perfected lien on Silver's Jewelry and Loan's pawn loans before those loans were sold or pledged to Gold, Gold took the loans encumbered by Great Lakes' lien. It is undisputed that Silver's Jewelry and Loan defaulted on its loan from Great Lakes. Under Article 9, Great Lakes had the right to take possession of its collateral and any proceeds of that collateral. *See* M.C.L. § 440.9609(1)(a)("after default, a secured party may .. . take possession of the collateral"); M.C.L. § 440.9607(1)(b)("after default a secured party may . . . take any proceeds to which the secured party is entitled under section 9315"). Gold has that collateral, including the pawn loans, interest and principal paid on the pawn loans, and any pawned items that were not redeemed by customers, because Gold converted the collateral by acquiring the loans from Silver's Jewelry and Loan without satisfying Great Lakes' outstanding lien against the collateral. Great Lakes is, therefore, entitled to recover the value of its collateral from Gold.

In addition to its arguments under Article 9, Gold argues that Article 9 does

29

not apply to its transactions with Jason Silver or Silver's Jewelry and Loan and, therefore, Gold did not convert Great Lakes' property. The Court will address each of Gold's arguments in turn.

Gold first argues that it paid full face value for each of the pawn tickets/loans. In other words, if Silver's Jewelry and Loan made a $1,000 pawn loan, Gold paid to Jason Silver or Silver's Jewelry and Loan $1,000 when it lent against or purchased that loan. According to Gold, it was the duty of Silver's Jewelry and Loan and Jason Silver, not Gold, to ensure that Great Lakes received that $1,000. Stated another way, Gold argues that it should not have to pay twice -- first to Silver's Jewelry and Loan by funding and/or buying the pawn loans and, again, to Great Lakes for converting those loans. While it is true that Silver's Jewelry and Loan had a duty to repay the money it borrowed from Great Lakes under its line of credit, its failure to do so does not negate Gold's conversion of Great Lakes' collateral. The simple fact is that Great Lakes was not paid by Silver's Jewelry and Loan and, while Gold may have been unaware of Great Lakes' liens, knowledge of such liens is not a required element of common law conversion.[16] Gold bore the risk that, by

_____

[16] It seems that secured lending of the type Great Lakes offered to Silver's Jewelry and Loan is highly unusual. At his deposition, Les Gold stated that while he understood that a bank could loan against a pawn shop's inventory (goods not timely redeemed by pawn customers), he was not aware that a pawn shop would make "loans on their loans" or that a bank would make a loan secured by pawn loans ("I would never understand loans by a bank on loans."). (Gold Dep. at 28-28 and 32-

retaining principal and interest payments owed pursuant to the pawn tickets, as well as any pawned items that were not ultimately redeemed, Gold was converting Great Lakes' collateral under Michigan common law.

Gold next argues that it could not have converted Great Lakes collateral because Great Lakes only had a *lien* in the pawn loans and liens cannot be converted. In support of this argument, Gold relies on a recent decision from the Michigan Supreme Court, *Alisa A. Peskin-Shepherd, PLLC v. Blume*, 974 N.W.2d 835 (Mich. 2022). In that case, the plaintiff, an attorney, asserted that her client committed conversion by selling real property on which plaintiff had an attorney's lien, without remitting her share of the sale proceeds.[17] To get around well-established Michigan law that real property cannot be converted, the plaintiff in *Peskin-Shepherd* claimed that the defendant converted her attorney's lien. The court rejected the argument. The court recognized that while a lien *may* be converted, such conversion involves exerting dominion over the documents memorializing the lien. *Id.* at 835-36 ("the lien was not the property that was converted; the lien only acted as the basis for the plaintiff's interest in the real property."). Because the defendant did not exert dominion over the documents memorializing the plaintiff's attorney lien, there was

33).

[17] Because the lien had not been properly recorded, it was not an encumbrance payable at closing out of the sale proceeds.

31

no conversion of the lien. The court went on to recognize that, distinct from converting the lien itself, "a lien holder may sue *for conversion of the property on which the lienholder's lien exists* if it is wrongfully disposed of by the owner." *Id*. n. 4 (quoting 51 Am. Jur. 2d (May 2022 update), Liens, § 77). Because the property at issue in that case was real property, no claim for conversion could be maintained. That is not the case here; personal property can be converted.

In the alternative, the plaintiff in *Peskin-Shepherd* asserted that the proceeds of the sale were converted. In rejecting that argument, the court explained that

> [T]here are specific requirements pertaining to when money can be converted: "[W]here there is no duty to pay the plaintiff the specific moneys collected, a suit for conversion may not be maintained." Here, plaintiff's claim to the sale proceeds as a result of her lien was just a claim for a certain amount of money up to the amount of the lien, but it did not relate to any specific monies… The lien was never recorded against the [] property for a specific monetary value and thus was never made a formal encumbrance requiring resolution prior to closing.

*Id*. at 836 (footnote omitted). Had the attorney lien been properly recorded, it would have been paid out of the proceeds when the sale closed. Because the lien was not properly recorded, the plaintiff had no claim on any specific proceeds of the sale and, therefore, no claim for conversion.

The holdings of *Peskin-Shepherd* do not further Gold's assertion that it did not convert Great Lakes collateral. While *Peskin-Shepherd* expressly recognized that a lien *may* be converted, it drew a distinction between conversion of a lien itself

32

(i.e. dominion over the documents memorializing the lien) and conversion of the collateral secured by the lien. Here, there are no allegations that Gold exerted dominion over the documents memorializing Great Lakes' lien (i.e. the promissory note, security agreement and UCC filing). Rather, at issue in this case is conversion of Great Lakes' underlying collateral -- the pawn loans -- a type of conversion expressly recognized by the Michigan Supreme Court. For the reasons previously explained, Gold did, in fact, convert Great Lakes' collateral.

The *Peskin-Shepherd* court also addressed the requirements for maintaining a cause of action for conversion of money, holding that conversion of money requires the existence of a "duty to pay the plaintiff the specific moneys collected." Gold asserts that it paid Silver's Jewelry and Loan face value for every pawn loan, and because Great Lakes promissory note "did not require Silver's Jewelry and Loan to turn over all proceeds from each pawn loan at the time such proceeds became available to Silver's Jewelry and Loan," neither Gold nor Silver's Jewelry and Loan had a duty to pay Great Lakes any specific monies. (Dkt. 224 at 4). This argument misapprehends the scope of Great Lakes' perfected security interest.

The monies converted in this case are *proceeds* of Silver's Jewelry and Loan pawn loans -- principal and interest payments on the pawn loans -- as well as proceeds from the sale of any collateral not redeemed by customers. Those proceeds are expressly covered by Great Lakes' security agreement. While the payment

33

arrangement between Great Lakes and Silver's Jewelry and Loan did not require it to remit to Great Lakes each payment Silver's Jewelry and Loan received from a customer the moment it was received (i.e. an immediate and direct dollar for dollar pass through), the financing arrangement was a line of credit, with monthly payments of principal and interest to be made by Silver's Jewelry and Loan to Great Lakes, and with Great Lakes monitoring the underlying collateral on a regular basis. Great Lakes' security agreement expressly required Silver's Jewelry and Loan to deliver to Great Lakes "all payments received in connection with the Collateral and from the sale, lease, or other disposition of any Collateral."   While Silver's Jewelry and Loan certainly defaulted under the terms of this arrangement, its default is independent of Gold's obligation not to convert Great Lakes' collateral.

Gold next asserts that it did not convert the pawn loans because it was a mere "bailee" who received Silver's Jewelry and Loan's pawn loans and the collateral underlying those pawn loans in good faith.[18]   In support of this assertion, Gold relies on M.C.L. § 440.7404, titled "Bailee's delivery in good faith pursuant to document of title.   That section provides:

A bailee that in good faith has received goods and delivered or otherwise disposed of the goods according to the terms of a document of title or pursuant

---

[18] Under M.C.L. § 440.7102(a), "'Bailee' means a person that by a warehouse receipt, bill of lading, or other document of title acknowledges possession of goods and contracts to deliver them." Under § 440.7102(g), "'Goods' means all things that are treated as moveable for the purposes of a contract for storage or transportation."

34

to this article is not liable for the goods even if any of the following apply:

(a) The person from which the bailee received the goods did not have authority to procure the document or to dispose of the goods.

(b) The person to which the bailee delivered the goods did not have authority to receive the goods.

Gold's reliance on this provision fails for several reasons.

First, a very significant portion of Silver's Jewelry and Loan's pawn loans were *sold* to Gold pursuant to the APA and in individual and bulk sales thereafter.[19] These pawn loans were not deposited with Gold pursuant to an express or implied bailment agreement. Gold was simply the purchaser of these loans, not a bailee. Section 440.7404 is, therefore, inapplicable. Second, with respect to the pawn loans which were funded by Gold, Gold acknowledges that Jason Silver *pawned* those loans to Gold.[20] Because Gold effectively made a non-recourse secured loan to Jason Silver, this lending relationship was not a bailment, and section 440.7404 is inapplicable to these "pawned pawn loans." Finally, neither Gold nor Silver's Jewelry and Loan had any rights in underlying pawned collateral unless and until

---

[19] Jason Silver specifically testified that "[a]fter that first purchase agreement with L&L Gold, each time that I went and took down more loans to them, I would get paid for the face value of the loans. He [Gold] was essentially buying the loans." (Silver Dep. at 42).

[20] Les Gold's assertions in this regard are entirely consistent with Jason Silver's testimony that he "was the customer to L&L Gold" and that he was "pawning [his] pawns." (Silver Dep. at 60).

35

the underlying pawnor failed to make the requisite interest payments and failed to redeem his or her property, at which point it became "inventory" subject to Great Lakes' lien in inventory. Perhaps the underlying pawnor was in an involuntary and undisclosed bailment relationship with Gold when Gold took possession of the pawnor's collateral, but that did not place Gold in a bailment relationship with Silver's Jewelry and Loan with respect to that underlying collateral.

For its final argument that the UCC does not apply here, Gold claims that it "originated" at least some of the pawn loans obtained by or through Silver's Jewelry and Loan, and that Jason Silver was acting as Gold's agent in exchange for a percentage of the interest paid by the underlying pawnor on the loans. Accordingly, because Great Lakes did not have a lending relationship with Gold, Great Lakes had no security interest in those loans Gold "originated" through Jason Silver, its agent.

In addressing whether an agency relationship has been created under Michigan common law, the Michigan Supreme Court has looked to:

> "the relations of the parties as they in fact exist under their agreements or acts" and note[d] that in its broadest sense agency "includes every relation in which one person acts for or represents another by his authority." *Saums v. Parfet*, 270 Mich. 165, 258 N.W. 235, 237 (Mich. 1935). We further recognized in *Saums* that "[t]he characteristic of the agent is that he is a business representative. His function is to bring about, modify, affect, accept performance of, or terminate contractual obligations between his principal and third persons." *Id*. at 235. Also fundamental to the existence of an agency relationship is the right to control the conduct of the agent, *Capitol City Lodge No. 141, FOP v. Meridian Twp*., 90 Mich.App. 533, 282 N.W.2d 383 (Mich. Ct. App.

36

1979), with respect to the matters entrusted to him. *See Int'l Longshoremen's Ass'n, AFL–CIO v. NLRB*, 56 F.3d 205, 211 (D.C. Cir. 1995) (citing 1 *Restatement, Second, Agency*, § 14, p. 60, and cases applying this principle).

*St. Clair Intermediate School Dist. v. Intermediate Educ. Ass'n*, 581 N.W.2d 707, 716 (Mich. 1998).

In the case at bar, it is apparent that Jason Silver was not Gold's agent, and Gold cannot be said to be the "originator" of the loans pawned to it by Jason Silver. There is no written agency agreement between Jason Silver and Gold, nor is there anything in the record to support the assertion that Jason Silver acted for or on behalf of Gold, or that he held himself out as having authority to represent Gold's interests.[21] To the contrary, great care was taken to hide from the underlying pawnor the fact that Jason Silver was selling or pawning loans originated by Silver's Jewelry and Loan to Gold. Les Gold testified that Jason Silver would lie to the pawnor, telling the customer that the pawned item had to be retrieved "from the vault." Jason would then drive down the street to Gold's location to recover the property. (Gold Dep. at 44).

Moreover, as the Michigan Supreme Court recognized, the right to control the

---

[21] In his deposition testimony, Jason Silver expressly stated that he was not an agent for Gold. (Silver Dep. at 47) ("When you say for L&L Gold, I think that, that you're still, that you're still somehow holding onto the fact that, that I was making loans for them, like I was their agent somehow, which is not the case.")

conduct of the agent is fundamental to the existence of an agency relationship. During his deposition, Les Gold took pains to distance Gold from the manner in which Jason Silver conducted business. Specifically referring to Jason Silver, Les Gold stated:

> It's not my business.  How you [Jason Silver] run your business is not my business, but when you [Jason Silver] owe me money, that's my business.  So it's not – it's not up to me to ask him [Jason Silver] is something wrong, you got family issues, it's not my business.  All I know is you owe me money, we need to straighten this out and that's when I got [my lawyers] involved.

Gold Dep. at 78-79. Given the absence of any supporting evidence, the Court cannot find that Jason Silver was Gold's agent or that Gold originated any of the pawn loans sold or transferred to it by Jason Silver.

For the foregoing reasons, the Court finds that there are no genuine issues of material fact regarding Gold's liability for common law conversion of Great Lakes' collateral.  Therefore, with respect to Count VI of Plaintiff's complaint, the only issue remaining for trial is the amount of damages suffered as a result of that conversion.

## CONCLUSION

For all of the above stated reasons, the Court grants Gold's Motion for Summary Judgment on Counts III and VII of the Complaint, and grants Great Lakes' Motion for Summary Judgment on Count VI as to liability only. Therefore, only Count V (liability and damages) and Count VI (damages only) remain for trial.

**Signed on December 9, 2022**



/s/ Joel D. Applebaum

**Joel D. Applebaum**
**United States Bankruptcy Judge**